IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

ERIC WILLIAMS,

    Petitioner,

v.                                      Case No. 2:18-cv-02021-MSN-tmp

BILL OLDHAM,

    Respondent.

**ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2241;
ORDER DENYING A CERTIFICATE OF APPEALABILITY;
ORDER CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH;
AND
ORDER DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court are the Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 ("§ 2241 Petition"), filed by Petitioner Eric Williams, booking number 16128709, a pretrial detainee at the Shelby County Jail in Memphis, Tennessee awaiting retrial, (ECF No. 1); Respondent's Answer to Habeas Corpus Petition, (ECF No. 17); and Petitioner's Response to Respondent's Answers to Habeas Corpus Petition, (ECF No. 18).  Because Williams has not demonstrated an entitlement to relief on his double jeopardy claim, the Court **DENIES** the § 2241 Petition.

**I.**      **BACKGROUND**

In July 2012, a Shelby County grand jury indicted Williams for one count of first-degree premeditated murder and one count of employing a firearm during the commission of a dangerous felony for the murder of William Frank Yancey.  (ECF No. 16-1 at PageID 146–49.)  A jury

found Williams guilty on both counts of the indictment, and he was given a life sentence. (*Id.* at PageID 158–59.)

### A. The Direct Appeal

On appeal, the Tennessee Court of Criminal Appeals ("TCCA") reversed the conviction and remanded the case for a new trial. (ECF No. 16-12 at PageID 1297.) The TCCA found that the "evidence is more than sufficient to show that the appellant intentionally and with premeditation killed the victim." (*Id*. at PageID 1313.) However, the TCCA stated,

> Based upon the record and the parties briefs, we conclude that the trial court erred by prohibiting the appellant from cross-examining State witnesses about his stating after the shooting that he did not intend to shoot the victim and that the trial court erred by allowing the jury to pull the trigger on a shotgun that was not the murder weapon. Moreover, we conclude that the cumulative effect of the errors warrants reversal of the appellant's conviction. Therefore, the appellant's conviction of first degree premeditated murder is reversed, and the case is remanded to the trial court for a new trial.

(*Id.* at PageID 1323; *see also id.* at PageID 1297)  *See State v. Williams*, No. W2013-01593-CCA-R3-CD, 2015 WL 1453389 (Tenn. Crim. App. Mar. 27, 2015).

Particularly relevant to this proceeding is the TCCA's ruling about the expert testimony in firearms identification of Special Agent Forensic Scientist Cervinia Braswell of the Tennessee Bureau of Investigation. (*See* ECF No. 16-12 at PageID 1306–08.) The TCCA summarized Braswell's "trigger pull" testimony as follows:

> Agent Braswell testified that each shotgun had a "trigger pull," which she described as the amount of pressure in pounds that was needed to pull the gun's trigger. She stated that the amount of pressure needed to push the button on a "walkie-talkie" was 2.09 pounds, that the amount of pressure needed to pull the trigger on a Windex bottle was four to five pounds, and that the amount of pressure needed to break the seal on a Coke can was six to seven pounds. Agent Braswell said she used the "weight free method" to determine the trigger pull for guns received by the TBI. She explained that the weight free method involved using a pole with a hook on one end, installing the hook over the trigger, and adding weights to the end of the

2

pole until the trigger pulled. She acknowledged that different guns had different trigger pulls.

Agent Braswell testified that double-barrel shotguns could have one or two triggers and that a person could load one or both barrels. If the shotgun had two triggers, then the person could pull each trigger separately or both triggers simultaneously. At the State's request, Agent Braswell brought to court a double-barrel shotgun from the TBI's firearm reference collection. She explained that the shotgun had two triggers, and she showed the gun to the jury. She acknowledged that the gun was "older" and said that the trigger pull on each of the triggers was 7.25 pounds. The State offered to let the jurors pull the triggers on the unloaded shotgun for demonstrative purposes. The record reflects that four jurors "fired" the gun.

Agent Braswell testified that the trigger pull for shotguns varied "a little more" than the trigger pull for handguns and ranged from five to ten pounds. She said that the average trigger pull for a double-barrel shotgun was 5.6 pounds and that she had never seen a double-barrel shotgun without a safety catch. She said that if the "sear" mechanism for a trigger was worn, less pressure was needed to pull the trigger and that the trigger pull could be less than five pounds.

On cross-examination, Agent Braswell acknowledged that her testimony on the average trigger pull for double-barrel shotguns was based on "trigger pull statistic sheets," which included trigger pull tests conducted in California in the 1980s. However, she explained that the data she considered had been published in the Association of Firearm and Tool Mark Examiners's quarterly journal and that such data had to be peer-reviewed by a board of directors and "put out" to all members in order to be published. She stated that in addition to the weight free method, trigger pull also could be determined with electronic or spring-loaded systems and that the three methods used to measure trigger pull had not changed since the 1980s. However, she acknowledged that the trigger pull data she considered for this case was based on a small sample of double-barrel shotguns and that she had no knowledge about the method used to collect the data or the calibration of the equipment used to collect the data.

Agent Braswell acknowledged that she could not say the appellant used a double-barrel shotgun to shoot the victim. She also never examined a gun related to this case and, therefore, did not know the trigger pull for the gun used in the shooting. She said that shotguns were manufactured in eight different gauges and that different manufacturers used different trigger pulls for their guns. She stated that trigger pull also could be affected by the cleanliness and wear of the gun, and she acknowledged that a gunsmith could "lighten" a trigger pull. She also acknowledged that many older shotguns did not have a safety catch and that a person typically did not hold a shotgun sideways when he or she fired it. Defense counsel asked Agent Braswell if a shotgun could have a "hair trigger" with a trigger

pull of less than one pound, and she answered, "I suppose." However, she said that she had never seen or heard of such a gun and that a person would still have to pull the trigger in order for the gun to fire.

On redirect examination, Agent Braswell acknowledged that in order for a gun to fire, the safety catch had to be off, and a person had to pull the trigger. Even if a gun's sear mechanism was worn, lessening the trigger pull, a person still had to pull the trigger in order for the gun to fire. At the conclusion of Agent Braswell's testimony, the State rested its case.

*Williams*, 2015 WL 1453389, at *8–9.

With regard to the shotgun evidence, Williams asserted that the trial court erred in allowing Braswell's testimony as an expert in firearms identification because the State did not provide counsel with the materials and reports that she relied on for her testimony as an expert in shotgun pulls. *Id.* at *15. Further, the State did not notify Williams that Braswell would testify as an expert until the Monday of trial. *Id.* The TCCA concluded that, based on the facts of the case, the admission of Braswell's testimony and the jury's handling of the TBI's gun, which was not the murder weapon, was error. *Id.* The TCCA determined that, despite the strong evidence against Williams, the conviction must be reversed given the cumulative effect of the errors in this case. *See id.* at *17.

### B. The Second Trial

In September 2016, the State tried Williams for the second time for first-degree premeditated murder. The State called Lieutenant Anthony Mullins of the Memphis Police Department as its last witness. (ECF No. 16-17 at PageID 1820.) Mullins testified that he did not find a shotgun, bullets, or casings at the scene, and the police were not able to recover the murder weapon. (*Id.* at PageID 1837, 1850–51.) After establishing that Mullins had been working as an officer for twenty-eight years and had experience with firing weapons, the

4

prosecutor asked, "Tell the jury, have you ever had a gun go off by itself without touching the trigger?" (*Id.* at PageID 1851.)

Defense counsel asked to approach, and the court held a bench conference. (*Id.* at PageID 1851–52.) The defense objected as to speculation saying that "[t]he state is backdooring this information in through this witness" like it did with Braswell. (*Id.* at PageID 1852.) The court noted that Mullins was asked about his personal experience, without any particulars or a reference to a double barrel shotgun. (*Id.*) The court noted that a foundation has been laid that the gun was not recovered and expressed that the question was fair, but "I don't think you can go any further than that." (*Id.*)

The prosecutor then asked,

> Lieutenant, in your twenty-eight years of experience in homicide, in the police department, dealing with guns – shotguns and all weapons like that, have you ever had a gun – or seen a gun – go off without someone putting some kind of pressure on the trigger?

(*Id.* at PageID 1852–53.) Mullins responded, "No, ma'am." The prosecutor then asked, "And can you tell them what you mean when we say pressure or–," and Lieutenant Mullins answered:

> To fire a firearm – pistol, rifle, shotgun – you have to engage the device. Okay. My side arm, a shotgun, a rifle, they all have triggers. You have to pull the trigger; varying amounts of pressure are required. It varies from weapon to weapon, but it takes several pounds of pressure to pull the trigger to make the firing pin drop – hit the primer and fire the bullet. If I take my pistol out and leave it right here, we can come back in a hundred years. It won't fire. It just won't. And that's the common debate, guns don't kill people; people kill people; guns don't fire by themselves, they just don't. You can apply something to that weapon to make it fire. You can damage it. You can beat it with a hammer. Maybe you can make the – you can cock a hammer back on some weapons and hit it enough times and spin it, and maybe it goes off because the hammer has enough pressure to drop, but you still have to manipulate that weapon in some manner to make it fire.

5

(*Id.* at PageID 1853.)   This was the last question in the State's case.   (*Id.* at PageID 1873.)   The State passed the witness, and the trial court took a brief recess before cross-examination.   (*Id.* at PageID 1853–54.)

    The court stated,

> Now, back to the issue of this gun, I told you not to go any further, and you went further.   And you went right into the trigger pull right when the Court of Criminal Appeals told you not to do that.   Dadgum it.

(*Id.* at PageID 1856.)   The defense then moved for a mistrial stating, "I knew where this question was going as soon as I heard those first few questions, which was essentially going into the same testimony that Ms. Braswell had previously testified about."   (*Id.* at PageID 1857.)   Defense counsel argued that her objection was the same as at the first trial "because a weapon was never found, examined, or tested that it was not only irrelevant but it was speculative and obviously extremely prejudicial to the defendant."   (*Id.*)   She contended that Mullins' testimony was more damaging because at least Braswell testified that guns do misfire while Mullins' testimony was "a bit heated, definitely prejudicial and more prejudicial than what Ms. Braswell had testified to." (*Id.*)   She noted that the TCCA found that the state of the weapon was relevant in this case, and the prosecution elicited the testimony to address the trigger pull even though they had no weapon.   (*Id.* at PageID 1861.)

    The prosecutor argued that the TCCA reversed because "there was cumulative error for several different things."   (*Id.* at PageID 1858.)   She noted that Braswell testified to the trigger pull for various weapons, including a double barrel shotgun that was brought and shown to the jury, allowing them to the pull the trigger.   (*Id.*)   She argued that Mullins' testimony could not

be more prejudicial than Braswell. (*Id.*) The prosecutor argued that the court could give a curative instruction to the jury to ensure there is no prejudice. (*Id.* at PageID 1858–60.)

Addressing the factors for granting a mistrial, the prosecutor argued that the testimony was not elicited and that Mullins' testimony was about firearms generally, not shotguns. (*Id.* at PageID 1859.) Further, the prosecutor argued that the State's case is strong, and Mullins' one statement was not enough to prejudice the jury. (*Id.* at PageID 1860.)

The trial court admonished the prosecution stating,

> I thought I was pretty clear when we were up at the side — after the objection was — I think the question was: "Have you ever seen a gun accidentally go off, " or something to that effect. An objection was made, you all approached — you came to the sidebar. We discussed it out of the presence of the jury, and I said, "You made your point, don't go any further. I said that. I said, "Don't go any further because I'm looking at this opinion, and that's what I've been trying to abide by their wishes even though I think it's highly relevant, they don't. They said, . . ." Even if marginally relevant, that the testimony's probative value is substantially outweighed by the danger of confusing the jury." I don't get it. I think if there's a missing shotgun. It's not the state's fault. I mean, you have to able to put on proof to refute that this was an accident; however, even though I disagree with them, I have to abide that this is the law of the case.

(*Id.* at PageID 1862.) The trial court noted that a special instruction could be used where there was missing evidence allowing for an inference of concealment or destruction of evidence and that was the only thing that the State could do because the TCCA said you could not put on proof about the trigger pull. (*Id.* at PageID 1862–63.)

The trial court noted that, even though he thought the TCCA's ruling was wrong, to go against the ruling could be inferred as "some kind of deliberate act upon the prosecutors." (*Id.* at PageID 1864.) The trial court noted that he just thought it was a bad mistake, but the TCCA was "going to look at it because they're going to see, on the record, that I told you not to go any further, and you did. And you went into the same very thing they told us to stay away from." (*Id.*)

The prosecutor argued that "it was completely unintentional" and that "in hindsight, I wished the question would have been worded much differently." (*Id.*)

The trial court asked the defense if she wanted to go forward with a mistrial. (*Id.* at PageID 1865–66.) The judge asked defense counsel to consider a curative instruction that Mullins is not an expert at firearms and that the jury was to disregard his testimony on that issues. (*Id.* at PageID 1867.) Defense counsel explained her hesitance about the curative instruction stating that:

> regardless of any curative instruction, once that testimony is out there, and especially from an experienced officer like Lieutenant Mullins, it's out there; and the jury, regardless of the court's instruction, that the fear is, since we're not back in that room, that the jury would potentially ponder what he had to say. So, I mean, at this juncture, we're obligated to stick by our motion.

(*Id.*)

In analyzing the factors for mistrial, the trial court said, there is no doubt that the State solicited the testimony, and then solicited it again — "the first being a mistake and the second one, I don't know how it got to the point where after I said, 'Don't do it,' did it." (*Id.* at PageID 1869–70.) The court agreed with the defense about the curative instruction. (*Id.* at PageID 1869–70, 73.) As to the relative strength of the case, the court found the state's case to be "extremely strong" noting that:

> They have someone who told his son to go get a — go get a shotgun. He declared his intent to kill the victim. The victim was unarmed. He shot the victim; and after shooting him, it was said, "I told him to stop effing with me." I think the state's proof very, very strong, so it was no need to going into this. They had the fact that the gun was missing.

(*Id.* at PageID 1870.) The trial court determined that, because of the TCCA's opinion, he had to grant a mistrial. (*Id.* at PageID 1871.)

8

The court did not believe that this was an instance where the prosecutor was goading the defense into a mistrial to get another opportunity to try the defendant because the case was "going south." (*Id.* at PageID 1871–72.) The court believed that there was "nothing to preclude this [case] from being retried again under the double jeopardy context." (*Id.* at PageID 1872.) Defense counsel's position was that "if Your Honor granted my motion . . ., if it's decided that they want to try this a third time. . . we will try it completely clean . . . ." (*Id.* at PageID 1873.)

Defense counsel filed a motion to dismiss the indictment based on double jeopardy. (ECF No. 16-18.) She argued that the State elicited Mullins' trigger pull testimony and that it was more prejudicial this time because of the excited way that he testified. (*Id.* at PageID 1877.) Defense counsel argued that the prosecution's two main lay witnesses (Shelton Malone and Candace Maples) were impeached with numerous statements and prior testimony creating credibility issues. (*Id.*)

A hearing was held on December 12, 2016. (*See* ECF No. 16-20.) Defense counsel emphasized that the only logical conclusion was that the State was trying to elicit information about the trigger pull because "[w]hy ask that question if you don't want the answer of, of course a gun can't misfire or you have to do these kinds of things for a gun to go off." (*Id.* at PageID 1890.) She argued that lawyers are trained to not ask questions to which they do not know the answer. (*Id.*) Defense counsel also noted that the second trial was different and allowed the defendant's statement that it was an accident. (*Id.* at PageID 1890.) Further, Roderick Johnson admitted that "we were at the party, people were drinking" and that the defendant reached back to grab the victim's throat, but he never really got his hands on him. (*Id.* at PageID 1891.) Defense counsel felt that Johnson's testimony was a mischaracterization of the facts. (*Id.*) Counsel

9

argued that the credibility of eyewitnesses Maples and Malone was "completely limited after hours of impeachments" and "what they said in their statement, what they said in the first trial and what they said in the second trial were all different." (*Id.* at PageID 1891–92.)

The prosecutor argued that her question was inartful, arguably negligent, and that she was trying to rephrase or narrow the question, but it did not rise to the level of intentionally goading the defense. (*Id.* at PageID 1893–95.) She further noted that the prosecution's case was not collapsing and that the witnesses' testimony was not "weaker than expected" because she "knew exactly what was going to be happening" and that their memories were not as strong as at the first trial. (*Id.* at PageID 1895.) The prosecutor asserts that "each of those witnesses testified consistently with what they had said in the first trial." (*Id.* at PageID 1895–97.) She contends that

> Nothing was unexpected. This is a situation where the proof was still consistently that this defendant had procured [hi]s shotgun, had declared his intent to kill his victim. This victim was unarmed. The evidence was clear that the defendant had become physically aggressive. The victim never touched him back and the defendant failed to provide any assistance as he walked away.

(*Id.* at PageID 1897.)

The trial court denied the motion to dismiss stating that "[t]his court finds that the proof in this case was overwhelming and well presented. Therefore, there was no need for the prosecution to goad the defense into asking for a mistrial." (ECF No. 16-21 at PageID 1912.) The court also notes that the reversal in the first trial was for cumulative errors, and the mistrial in the second trial "was caused, in an abundance of caution, by an honest yet mistaken interpretation" of the TCCA's opinion. (*Id.*) Further, the trial court found "no deliberate misconduct by the prosecution in this matter." (*Id.*)

10

The trial court granted permission to appeal. (ECF No. 16-23.) Defense counsel filed a Rule 9 Application for Interlocutory Appeal By Permission. (ECF No. 16-24.) The TCCA denied the application stating that the case "does not meet the criteria for review" because "the question presented is primarily factual in nature" and does not present the need to develop a uniform body of law. (ECF No. 16-26 at Page ID 1940.)

## II.     THE § 2241 PETITION

Williams asserts the following grounds for relief:

1. Double jeopardy because the State goaded Williams into a mistrial at his second trial by presenting evidence that the Tennessee Court of Criminal Appeals had determined was irrelevant, prejudicial, and inadmissible, (ECF No. 1 at PageID 6–7);

2. Ineffective assistance of counsel related to trial counsel's filing of an interlocutory appeal, failure to move for a judgment of acquittal, refusal to give Williams copies of the trial transcripts, and refusal to file an appeal to the Tennessee Supreme Court after the interlocutory appeal was denied, (*Id.* at PageID 7); and

3. Fifth and Sixth Amendment violations because the trial court overruled defense counsel objections and gave a limiting instruction of testimony and questioning of evidence knowing that the evidence was not to come before the jury on retrial and depriving Williams of his due process rights, (*Id.* at PageID 8).[1]

Williams seeks immediate release from custody due to unfair prejudice resulting in him being endangered of twice being placed in double jeopardy. (*Id.*) Respondent argues that the double jeopardy claims lack merit and the ineffective assistance claims have not been exhausted in the state courts. (ECF No. 17 at PageID 1943, 1958.)

---

1. Respondent enumerates the claims as double jeopardy, ineffective assistance of trial and appellate counsel, trial court error related to the mistrial, and violations of Williams' civil rights. (*See* ECF No. 17 at PageID 1942–43.) The Court notes that in 2017, Williams filed a habeas petition in state court which was entitled as if it was filed under 28 U.S.C. § 2254. (*See* ECF No. 1 at PageID 6). That petition was filed as an exhibit to the instant § 2241 Petition. (*See* ECF No. 1-5). However, the Court does not adopt the claims previously addressed in Williams' state habeas petition as they are not specifically enumerated in the § 2241 Petition before this Court.

11

### III.    ANALYSIS OF PETITIONER'S CLAIMS

Respondent argues that Williams' double jeopardy claim lacks merit and his remaining claims are not exhausted in state court and not properly before the federal court for habeas review. (ECF No. 17 at PageID 1943, 1958.)

#### A.  Habeas Relief for a Pretrial Detainee

Williams is a state pretrial detainee awaiting retrial. This Court is authorized to issue a writ of habeas corpus on behalf of a pretrial detainee if he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Except in extraordinary circumstances, the habeas remedy cannot be invoked to raise defenses to a pending state criminal prosecution. *See, e.g., Younger v. Harris*, 401 U.S. 37 (1971) (declining to enjoin prosecution under an unconstitutional statute); *Fenner v. Boykin*, 271 U.S. 240 (1926); *Ex parte Royall*, 117 U.S. 241 (1886); *Ballard v. Stanton*, 833 F.2d 593 (6th Cir. 1987); *Zalman v. Armstrong*, 802 F.2d 199 (6th Cir. 1986). Federal injunctions against state criminal proceedings can be issued only "under extraordinary circumstances, where the danger of irreparable loss is both great and immediate." *Younger*, 401 U.S. at 45. The Supreme Court has emphasized that:

> [c]ertain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered "irreparable" in the special legal sense of that term. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution.

*Id.* at 46. "'Extraordinary circumstances' [must] render the state court incapable of fairly and fully adjudicating the federal issues before it[.]" *Kugler v. Helfant*, 421 U.S. 117, 124 (1975). "The Sixth Circuit has only recognized three such exceptional circumstances: (1) when the petitioner seeks a speedy trial; (2) when the petitioner seeks to avoid a second trial on the basis

that it would violate the Double Jeopardy Clause; and (3) when the petitioner seeks to challenge the state's attempt to retry him rather than allow him to accept an initial plea offer originally rejected due to ineffective assistance of counsel." *Simpson v. Jones*, No. 11-cv-422-JBC-CJS, 2012 WL 3912755, at *3 (E.D. Ky. July 16, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 3912738 (E.D. Ky. Sept. 7, 2012). Federal courts also are not authorized to conduct "an ongoing federal audit of state criminal proceedings[.]" *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974).

Williams' double jeopardy claim may be reviewed as one of the extraordinary circumstances under § 2241. *See Smith v. Coleman*, 521 F. App'x 444, 447 (6th Cir. 2013) ("[B]ecause his petition was filed before his second trial and attacked his pretrial detention rather than a state court judgment or conviction, his petition is 'properly governed by [28 U.S.C.] § 2241' and subject to de novo review."). However, Williams' remaining claims are not cognizable under § 2241. Further, as he is not being held pursuant to a judgment of the state court, he has no habeas right to relief under 28 U.S.C. § 2254(a).[2] *See Phillips v. Court of Common Pleas, Hamilton Cty., Ohio*, 668 F.3d 804, 809 (6th Cir. 2012) (defendant is in custody pursuant to an indictment, not a state court judgment as in 28 U.S.C. § 2254, and review is not subject to AEDPA deference).

### B. Exhaustion

Habeas petitioners must exhaust all available state court remedies before proceeding in federal court, and this usually requires that they appeal an adverse decision all the way to the state's

---

2. If Williams is convicted, he can return to federal court by filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254, after exhausting his claims in state court, that raises any or all of the issues presented in his § 2241 Petition. Fourth Amendment claims cannot be raised in federal habeas petitions where they can be fully and fairly adjudicated in state court. *Stone v. Powell*, 428 U.S. 465, 489–95 (1976).

court of last resort. *Klein v. Leis*, 548 F.3d 425, 430 n. 2 (6th Cir. 2008).[3] The petitioner has the burden to establish exhaustion. *See Smith v. Burt*, No. 19-1488, 2019 WL 5608064, at *1 (6th Cir. Oct. 28, 2019).

A pretrial detainee exhausts his double-jeopardy claim when he moves to dismiss the charges against him, and, where the state permits interlocutory appeals, pursues his argument through the state's highest court. *Winburn v. Nagy*, 956 F.3d 909, 913 (6th Cir. 2020); *see also Phillips*, 668 F.3d at 811 ("[T]he federal adjudication of double jeopardy claims raised on pre-trial petitions for habeas corpus is appropriate when those claims have been raised and rejected in the state trial court and under state law there is no right to interlocutory appeal.") (quoting *Harpster v. Ohio*, 128 F.3d 322, 325 (6th Cir. 1997)). "Because the Double Jeopardy Clause prevents being twice placed in jeopardy for the same offense—that is, simply being tried twice for the same offense—to 'enjoy the full protection of the Clause, [a defendant's] double jeopardy challenge ... must be reviewable before [the] subsequent exposure occurs.'" *Phillips*, 668 F.3d at 811 (quoting *Abney v. United States*, 431 U.S. 651, 662 (1977)) (alterations in the original). As Williams has pursued and been denied interlocutory appeal in this instance, he is entitled to proceed on his double jeopardy claim before retrial. Respondent does not dispute exhaustion of the double jeopardy claim. (ECF No. 17 at PageID 1943.)

### C. Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982). The

---

3. In the § 2241 context, decisional law has superimposed exhaustion as a requirement to accommodate principles of federalism. *Phillips*, 668 F.3d at 811 n.4.

Double Jeopardy Clause of the Fifth Amendment, which is made applicable to states by the Fourteenth Amendment, applies only when a criminal case has progressed to the point at which jeopardy "attaches." The Double Jeopardy Clause generally "does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988). However, double jeopardy generally bars re-prosecution "[w]here the trial is terminated over the objection of the defendant," "except if the government can meet the manifest necessity standard (e.g., in the case of a hung jury)." *See Kennedy*, 456 U.S. at 672; *see also Smith*, 521 F. App'x at 448. "Whether a retrial would amount to 'double jeopardy' oftentimes turns on who requested the underlying mistrial." *See United States v. Foster*, 945 F.3d 470, 474 (6th Cir. 2019).

In Williams' case, where a mistrial has been declared at the behest of the defendant, the Double Jeopardy Clause is not a bar to retrial *except* "where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 673, 76. In *Kennedy*, the Supreme Court outlined the parameters of prosecutorial misconduct that might lead to a bar to retrial:

> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes "a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *United States v. Scott*, 437 U.S. 82, 93, 98 S. Ct. 2187, 2195, 57 L.Ed.2d 65 (1978). Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." *United States v. Dinitz*, supra, 424 U.S., at 609, 96 S. Ct., at 1080. Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a

> defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

*Kennedy*, 456 U.S. at 675–76.

The Sixth Circuit has held that "the only relevant intent to the double jeopardy inquiry is the prosecutor's 'intent to terminate the trial[.]'" *Smith*, 521 F. App'x at 449; *see also United States v. Colvin*, 138 F. App'x 816, 820 (6th Cir. 2005) ("[T]he defendant must demonstrate more than a deliberate act on the part of the prosecutor: 'there must be a showing that the prosecutor's deliberate conduct was intended to provoke the defendant into moving for a mistrial.'") (quoting *United States v. White*, 914 F.2d 747, 752 (6th Cir. 1990)). The Sixth Circuit and other courts have been reluctant to find the intent necessary to satisfy the *Kennedy* standard. *See United States v. Koubriti*, 509 F.3d 746, 749–50 (6th Cir. 2007); *Hampton v. Moore*, No. 2:07-cv-747, 2008 WL 4137905, at *11–*12 (S.D. Ohio Aug. 28, 2008); *see also Kitchen v. Court of Common Pleas, Ross Cty., Ohio*, No. 2:19-CV-3618, 2020 WL 264351, at *7–*8 (S.D. Ohio Jan. 17, 2020).

In *Colvin*, the Sixth Circuit noted that we must examine the prosecutor's "intent from objective facts and circumstances" to determine whether the misconduct was sufficient to invoke the Double Jeopardy Clause. *Colvin*, 138 F. App'x at 820. Whether a prosecutor intended to provoke a mistrial motion is a question of fact. *Wooten v. Warren*, 814 F. App'x 50, 58 (6th Cir. 2020), *cert. denied*, No. 20-6083, 2020 WL 7132508 (Dec. 7, 2020); *see also Foster*, 945 F.3d at 474 (same). Deference is given to the trial court's assessment of the prosecutor's intent based on observations at trial. *See id.*; *see also Phillips*, 668 F.3d at 812 (finding it "appropriate to give deference to the trial court's factual finding regarding the intent of the prosecutor because it was in the best position to make the finding"); *White*, 914 F.2d at 752 (giving "great deference" to the trial court's finding on the prosecutor's intent).

The record in this case demonstrates that, when the inappropriate questioning began, defense counsel immediately objected, and the court indicated that the prosecutor should not go further on the line of questioning about the trigger pull. Before the prosecutor completed her question, Mullins opined his views about the trigger pull. Defense counsel did not object, but, at recess, she moved for a mistrial.

Mullins was the prosecution's last witness, and his statement about the trigger pull was the last question presented. The prosecutor asserted that her question was "inartful," "completely unintentional," and that she was trying to narrow the question when Mullins began his answer. Further, much discussion was had about whether a mistrial or curative instruction would be appropriate and the likelihood of a double jeopardy bar under the circumstances. The trial court did not consider the prosecution's actions to be deliberate and found no reason, given the strong evidence presented, why the prosecution would try to force a mistrial.

This Court's review of the evidence presented at the second trial showed that the prosecution's case was strong, where eyewitnesses Malone and Maples testified about Williams' anger and irritability and that he shot Yancey with a shotgun when Malone was trying to take Yancey away from the scene. (ECF No. 16-15 at PageID 1573; *see also* ECF No. 16-16 at PageID 1670–90, 1720, 1736–37.)

Giving deference to the trial judge's factual findings, it cannot be said that the prosecution was trying to goad the defendant into a mistrial to have a third opportunity to try the case. At best, it appears that the prosecution was attempting to discredit a defense that Williams accidentally fired the shotgun. The intent then would be to secure the conviction, rather than force a mistrial. *See United States v. Gonzalez*, 248 F.3d 1201, 1204 (10th Cir. 2001) (government's

17

appeal of the district court's grant of defendant's mistrial motion not barred because the government's intent in introducing allegedly prejudicial evidence may have been to obtain a conviction rather than a mistrial); *see also Greyson v. Kellam*, 937 F.2d 1409 (9th Cir. 1991) (no double jeopardy bar to retrial where misconduct showed the prosecutor's desire to convict, and not an intent to goad defendant into moving for mistrial). The record does not reflect that the prosecution gained any tactical advantage by the declaration of the mistrial. The double jeopardy claim is without merit.

Williams is not entitled to a writ of habeas corpus. The § 2241 Petition is **DENIED**. Judgment shall be entered for Respondent.

## IV. APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a habeas petition and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b). The Sixth Circuit has determined that a COA is required to for "all state-prisoner habeas appeals, whether seeking pretrial relief under § 2241 or post-conviction relief under § 2254." *See Winburn*, 956 F.3d at 912.

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)

(internal quotation marks omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

In this case, there can be no question that Petitioner's claims have not been exhausted. Because any appeal by Petitioner on the issues raised in his § 2241 Petition does not deserve attention, the Court **DENIES** a COA.

Fed. R. App. P. 24(a)(1) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a)(4)–(5). For the same reasons the Court denies a COA, the Court concludes that an appeal would not be taken in good faith. It is therefore **CERTIFIED**, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is **DENIED**.[4]

**IT IS SO ORDERED**, this 30th day of September, 2021.

*s/ Mark Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE

---

4. If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).